# NEW YORK STATE DEPARTMENT OF SOCIAL SERVICES, Plaintiff,

v.

### Otis R. BOWEN, Secretary, et al., Defendants.

### Civ. A. No. 84–3620.

United States District Court, District of Columbia.

Nov. 21, 1986.

Charles A. Miller, Washington, D.C., for plaintiff.

Edith S. Marshall, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

This case entails a dispute between the State of New York and the federal government over which is to bear the cost of some $66.3 million spent by plaintiff New York State Department of Social Services ("DSS") in providing certain social services to foster children receiving funds from the Aid to Families With Dependent Children-Foster Children ("AFDC–FC") program under the Social Security Act. Although aware of a pervasive uncertainty as to the matter as early as November, 1976, it was not until mid–1981 that defendant United States Department of Health and Human Services ("HHS") got around to publishing an agency-wide directive declaring that the states were no longer entitled to federal reimbursement for some of their expenditures for such services following major revisions of the Social Security Act in October, 1975. In the meantime, New York, as well as other states, had continued to provide the services in a misbegotten expectation of eventual reimbursement for which it blames HHS. When one of its claims (for approximately $8.5 million) was officially disallowed in October, 1981, New York appealed to HHS' Departmental Grant Appeals Board (the "Board"), which, in July, 1983, affirmed the disallowance. Other claims were later disallowed and similarly affirmed. The parties agree that the several decisions of the Board constitute final agency action with respect to each, and that all are now properly before this Court for review pursuant to the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06 (1982).

New York seeks declaratory and injunctive relief, contending that the Board's decisions erroneously interpreted the governing statutory law; that HHS inequitably gave retroactive effect to the 1981 directive prohibiting reimbursement, the seemingly authoritative intimations DSS had received to the contrary over the preceding four years having accurately reflected an earlier official agency policy which the 1981 directive reversed; and that the 1981 directive was, in any case, a legislative rule which required notice-and-comment before it could become effective at all. The case is now before the Court on cross-motions for summary judgment. The issue upon which the Court makes disposition of the case being entirely one of law, for the reasons hereinafter set forth plaintiff's mo-

tion for summary judgment will be denied, defendant's motion will be granted, and the amended complaint dismissed with prejudice.

## I.

The complex, intricately interrelated statutory scheme under which this controversy arises is meticulously described by the Board in its Decision No. 449, No. 82–117–NY–HD of July 29, 1983 (R. 302–327), and its exposition in full is not relevant for present purposes. In brief and oversimplified summary, from 1961 through 1975 the federal government undertook to subsidize the states' expenditures for certain social services it required the states to furnish its children in foster care who were receiving AFDC income maintenance payments under Title IV–A of the Social Security Act (the "Act"), 42 U.S.C. §§ 601–15 (1982), e.g., their placement in suitable foster homes and development and oversight of appropriate plans of foster care.

Effective October 1, 1975, Congress amended the Act by adding Title XX, which established a comprehensive program for the provision of social services generally. Pub.L. No. 93–647, 88 Stat. 2337 (1975) (current version at 42 U.S.C. § 1397 (1982)).[1] Section 2002(a)(1) of the new statute authorized federal financial participation in state expenditures for various services to the needy directed at certain statutorily prescribed goals, several of which embraced foster care for children, e.g., preventing child abuse or neglect and preserving the integrity of families. 88 Stat. at 2337–43. Title XX also established an appropriations cap limiting the amount of federal money which could be expended, and prescribed a formula by which a maximum annual allotment for each state would be calculated. *Id.*

At the same time it added Title XX to the Act, Congress also amended the section of the Act that authorized payment to the states for their Title IV–A administrative expenses, including AFDC–FC. Pub.L. No. 93–647 § 3, 88 Stat. 2337, 2348 (1975). As amended, section 403(a)(3) of the Act still authorized reimbursement of a percentage of a state's *administrative* costs for AFDC, with, however, a proviso:

> ... except that no payment shall be made with respect to amounts expended in connection with the provision of any service described in section [2002(a)(1) of this Act] other than services the provision of which is required by [section 402(a)(19) of this Act] to be included in the plan of the State....

42 U.S.C. § 603(a)(3) (1976) (current version at 42 U.S.C. § 603(a)(3) (1982)).[2] It is the significance to be ascribed to the "except clause" that lies at the heart of the current controversy: specifically, whether Congress intended it to bar even non-duplicative reimbursement for administrative costs associated with *social* services (except for the WIN program) under Title IV–A.

New York submits its claims for reimbursement to Region II, the field office of HHS overseeing New York. After Title XX went into effect, DSS routinely began to make claims for each county for the social services rendered by foster care caseworkers under Title XX until the state's allotment under that title was exhausted, then it claimed the remainder under Title IV–A, at a lower rate of reimbursement, but without a cap. In November, 1976, the Regional Office disallowed DSS' first claim (for about $1.3 million), citing as the reason what might have been merely an accounting error: DSS' failure to allocate costs between income mainte-

---

1. Title XX has been amended a number of times since 1975. All references to Title XX herein are to the statute in effect from 1975 to 1981.

2. Section 402(a)(19)(B) of the Act, 42 U.S.C. § 602(a)(19)(B) (1982), refers to social and sup-

portive services necessary to enable certain AFDC recipients to accept employment or receive manpower training under the Work Incentive Program ("WIN") established by Title IV–C of the Act, 42 U.S.C. §§ 630–45 (1982 & Supp. III 1985).

nance and social services activities.[3] DSS asked for a reconsideration in April, 1977.

Then, on June 17, 1977, the Regional Office sent DSS an informational copy of a one-page "memorandum," dated May 18, 1977, from a Mildred Hoadley, then director of HHS' Division of Income Maintenance Policy, Assistance Payments Administration, at HHS' Central Office in Washington, D.C.,[4] to an associate regional commissioner in California, purporting to advise the latter, in response to a query, that "a State may claim [reimbursement] under [T]itle IV–A for carrying out any provision required in [T]itle IV–A." [5] Accompanying the memorandum was an informational copy of a Region II Office recommendation to the Central Office that the November, 1976, disallowance of DSS' claim be withdrawn.

A few days later, a Region II associate commissioner advised DSS (apparently on the basis of the Hoadley memorandum) to amend its Title IV–A cost allocation procedure to classify all AFDC–FC activities, whether related to income maintenance or social services, as reimbursable "administrative" costs. DSS relied upon this apparently authoritative instruction, did as suggested, and assumed henceforth that all doubt had been resolved that it could properly claim reimbursement under Title IV–A for all services its caseworkers rendered, including social services for its AFDC children in foster care, after exhausting its Title XX allotment, which it then proceeded to do for each of the years in issue here.[6] Some of its claims were promptly paid

without question. Others remained in various stages of bureaucratic limbo for the next four years.

Finally, on June 24, 1981, HHS issued "Action Transmittal SSA–AT 81–18," the pronouncement HHS contends represents its first "official policy" statement on the subject, declaring that states could *not* claim reimbursement for any of its caseworker social services to foster care children under Title IV–A (although Title IV–A still required that they be provided) on the ground that the "except clause" prohibited payment for any such services, and had done so since it was enacted in 1975. The Action Transmittal concluded: "[s]tate plans and cost allocation plans that allow costs for these services under [T]itle IV–A have been approved in error. HHS Regional Offices will be acting to disallow [reimbursement] under [T]itle IV–A where such claims have been paid or deferred."

On October 20, 1981, HHS notified DSS that it was disallowing one of its Title IV–A claims for foster care social service costs incurred between July, 1976, and March, 1979, totalling approximately $8.6 million. In July, 1982, New York appealed the disallowance to the Grant Appeals Board, but the Board's Decision No. 449 upheld the disallowance on July 29, 1983, in the comprehensive ruling that became the basis for all disallowances at issue here. On November 28, 1984, DSS filed this action seeking judicial review of Decision Nos. 449 and 552, later amending its com-

---

**3.** Published regulations required claimants to allocate separately their costs for income maintenance and social services activities when claiming reimbursement under Title IV–A. 45 C.F.R. § 232.30 (1976), *as amended,* 47 Fed.Reg. 17,508 (1982).

**4.** The agency was, at the time, called the Department of Health, Education, and Welfare.

**5.** HHS dismisses the memorandum as nothing more than a "memorialization" of a telephone conversation between Hoadley and the associate regional commissioner, which did not purport to make any analysis of the law whatsoever.

New York maintains that the memorandum is, in effect, an "official" reflection of HHS "policy," or its equivalent, which DSS reasonably viewed as such.

**6.** New York submits that reliance was particularly poignant in its case, because New York City was at the time on the verge of bankruptcy. Without the anticipated Title IV–A funding, the City would have been forced to reduce its other services expenditures or raise additional tax revenues, or both, to cover its AFDC–FC expenses. New York City ultimately incurred approximately three-quarters of the currently disallowed expenditures.

plaint to include a challenge to Decision No. 614.[7]

## II.

In its appeal of HHS' disallowances New York was represented throughout by the able counsel who are appearing for it here, and the same arguments (and another—estoppel—since abandoned) were thoroughly briefed and presented to the Board. The Board rendered its own equally thorough analysis of the Act in its 27–page Decision of July 29, 1983, in which it found, *inter alia,* the language of the "except clause" to be unambiguously definite in its prohibition of the reimbursements DSS was seeking.

The interpretation given the Act by HHS, the agency charged with administering the expenditures it authorizes, is entitled to "substantial deference" by a reviewing court. *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982). If the agency has considered the relevant factors, and its reasoning is thorough and consistent, a reviewing court may not substitute its judgment for that of the agency, *Center for Auto Safety v. Peck,* 751 F.2d 1336, 1342 (D.C.Cir.1985) (citing *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto. Ins.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983)); *Federal Election Comm. v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38, 44–45, 70 L.Ed.2d 23 (1981), nor may it adopt its own construction of the agency's governing statute in preference to the agency's if the latter's is reasonable. *Connecticut Dept. of Income Maintenance v. Heckler,* 471 U.S. 524, 105 S.Ct. 2210, 2215, 85 L.Ed.2d 577 (1985).

The Supreme Court has stated that "the starting point for interpreting a statute is the language of the statute itself," and "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm. v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The text of the statute thus being clearly a "relevant factor," and the Board's literal reading of it certainly a reasonable, although harsh, one (for New York's purposes), this Court must give it the deference that is its due, unless there appears a "clearly expressed legislative intention to the contrary."

New York contends that the legislative intention with respect to the October, 1975, amendments is sufficiently obscure to have admitted of agency interpretation. As the Court of Appeals for this Circuit has observed, an agency's "shifting interpretation of its statutory authority bespeaks of an ambiguity in the statute's language and legislative history." *Process Gas Consumers Group v. United States Dept. of Agriculture,* 694 F.2d 778, 792 (D.C.Cir.1982) (*en banc*) (footnote omitted), *cert. denied,* 461 U.S. 905, 103 S.Ct. 1874, 76 L.Ed.2d 807 (1983). According to New York, until June of 1981, when HHS issued its Action Transmittal 81–18 declaring foster care caseworker social services under Title IV–A to be nonreimbursable, HHS' officials at both national and local offices had officially "interpreted" the legislation otherwise. New York argues, therefore, that Action Transmittal 81–18 represented an interpretive shift in HHS' reading of ambiguous legislation, one it may have been entitled to make, but which was nevertheless a "policy change," the retroactive application of which, the argument continues, to disallow its expenditures of some six years past would, in the circumstances, be inequitable. *See SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947); *Retail, Wholesale and Depart-*

7. On November 28, 1983, HHS notified DSS that it had re-disallowed DSS' initial claim for the $1.3 million in costs incurred between October 1 and December 31, 1975. Again, after DSS' appeal, the Board upheld the disallowance on July 16, 1984 (Decision No. 552). Finally, on June 27, 1984, HHS notified DSS of the disallowance of an additional $56 million in costs incurred between January, 1976, and September, 1980, and the Board, on December 20, 1984, once again upheld the disallowance. (Decision No. 614).

*ment Store Union v. NLRB,* 466 F.2d 380, 390 (D.C.Cir.1972).[8]

 The Grant Appeals Board, however, did not stop with a careful reading of the 1975 legislation itself. It also examined the legislative history, such as it is, as well as the entire statutory mechanism by which Congress has sought to apportion the costs of AFDC and related social services between state and federal governments. It found nothing in either to suggest that its reading of the "except clause" was out of harmony with the remainder; Congress had all along intended exactly what it said, leaving no ambiguity open to agency interpretation. The Court finds the Board's reasoning to be logical, its method appropriate to the ascertainment of an occult legislative intent, and once again concludes that it must accept the result the Board reached, whether or not it would have done likewise on its own.[9] *See Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 & n. 11, 104 S.Ct. 2778, 2782 & n. 11, 81 L.Ed.2d 694 (1984).

Equities notwithstanding, no "policy," however salutary, venerable, or "official,"

can be enforced in contravention of an express statutory command. Agencies are simply not entitled to do what they are not authorized by statute to do, no matter how reasonable it may seem to them, or to a court, that they be allowed to do it. *See American Bankers Ass'n v. SEC,* 804 F.2d 739, 749 (D.C.Cir.1986). The Board found that in 1981 HHS had belatedly discovered a misapprehension on the part of some of its personnel as to what the statute permitted and corrected it. This Court has accepted the Board's conclusion as to the purport of the legislation. There are, therefore, no equities to balance. The language of the statute is mandatory; HHS officials never had authority or discretion to give dispensation from it, and, unfortunately for New York, the rule is that "those who deal with the Government are expected to know the law and may not rely on the conduct of government agents contrary to law." *Heckler v. Community Health Servs.,* 467 U.S. 51, 104 S.Ct. 2218, 2226, 81 L.Ed.2d 42 (1984) (footnote omitted). Even if there are exceptions to the rule, there is no evidence of the "affirmative misconduct" of government officials which would be necessary, at a minimum,

---

**8.** New York has submitted affidavits of Mildred (Hoadley) O'Keefe and Florence Aitchison, the Region II associate commissioner from 1969–80, both now retired from government service, attesting to their perceptions of a consensus within the agency between 1975 and 1981 that social services costs remained reimbursable under Title IV–A. HHS has moved to strike the affidavits on the ground that they were not a part of the administrative record before the Board, and, thus, are not properly before the Court in its review of the Board's decision. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419–20, 91 S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971); *see also Formula v. Heckler,* 779 F.2d 743, 745 n. 2 (D.C.Cir.1985). The tenor of both affidavits, however, is merely to make express what is implicit in the administrative record, viz., that some mid-level HHS officials were under the foregoing impression notwithstanding the 1975 amendments to the Act, and that those officials shared their impressions with one another and with their client states. In the light of the disposition made of the case on the merits, the motion to strike will be denied as moot.

**9.** At least one other court has *de novo* agreed with the Board as to the correct statutory inter-

pretation. *See Oregon Dept. of Human Resources & Children's Servs. Div. v. Heckler,* —— F.Supp. ——, No. 83–1466 (D.Or. Jan. 31, 1984).

New York also contends that Action Transmittal 81–18 constituted a legislative rule-making requiring formal notice-and-comment pursuant to the APA, 5 U.S.C. § 553 (1982).

The notice-and-comment procedures of the APA do not apply, however, to an agency's "interpretative rules." 5 U.S.C. § 553(b)(3)(A). There can be no question that Action Transmittal 81–18 was an interpretative rule, as that term has been defined by the D.C. Circuit:

Generally speaking, it seems to be established that 'regulations,' 'substantive rules' or 'legislative rules' are those which create law, usually implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means.

*Gibson Wine Co. v. Snyder,* 194 F.2d 329, 331 (D.C.Cir.1952), *quoted in Cabais v. Egger,* 690 F.2d 234, 238 (D.C.Cir.1983). The APA does not require an agency to hold a referendum each time it reads a statute to see if public agrees with it.

to justify a departure from it. *See id.* 104 S.Ct. at 2228 (Rehnquist, J., concurring).[10]

The Board's decision being rational and in accordance with law, for the foregoing reasons, therefore, it is, this 21st day of November, 1986,

ORDERED, that plaintiff's motion for summary judgment is denied; and it is

FURTHER ORDERED, that defendant's motion for summary judgment is granted, and the amended complaint is dismissed with prejudice; and it is

FURTHER ORDERED, that defendants' motion to strike is denied as moot.

**10.** The entire episode, however, reflects no credit on HHS. From 1976 forward responsible officials knew that several states, at least those with social services costs approaching reimbursable limits under Title XX, were anxious to know whether they could continue to incur them with expectations of further reimbursement of some of them under Title IV–A. Both claims and disallowances were awaiting decisions. Yet no one at HHS made a definitive reading of the statute, much less a request of Congress for clarification, until New York's reliance upon the misleading signals it had been given had mounted to vast proportions. HHS' inexplicable neglect of its obligation to make a decision expeditiously was arguably more injurious to New York than an early adverse decision itself could ever have been, and might very well have worked an estoppel upon it were it a private party.