### N.Y. STATE DEPARTMENT OF SOCIAL SERVICES, Appellant,

v.

### Otis R. BOWEN, Secretary, H.H.S., et al.

No. 87–5031.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 2, 1987.

Decided Dec. 22, 1987.

Charles A. Miller, with whom Richard A. Friedman, Washington, D.C., was on the brief, for appellant.

Jaclyn Taner, Office of the General Counsel, U.S. Dept. of Health and Human Services, New York City, of the Bar of the Court of Appeals of New York, pro hac vice by special leave of Court, with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence, Edith S. Marshall and Robert C. Seldon, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.

Peter L. Zimroth, Corp. Counsel for the City of New York, New York City, was on the brief for amicus curiae, The City of New York, urging reversal.

Before ROBINSON, RUTH BADER GINSBURG and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This is an appeal from a District Court decision upholding disallowances by the Department of Health and Human Services (HHS) of claims for reimbursement filed by the New York State Department of Social Services. In its claims, New York sought recoupment of costs incurred in providing certain social services to foster children eligible for assistance under the Aid to Families with Dependent Children (AFDC) program, established by Title IV-A of the Social Security Act (the Act), 42 U.S.C. §§ 601–615 (1982 & Supp. III 1985). Reviewing New York's contentions, the District Court deferred to HHS' interpretation of the governing statutory provisions and granted the Department's motion for summary judgment.

Although we disagree with HHS' position that the Social Security Act unambiguously supports only one permissible interpretation, we do agree, more modestly, that HHS' interpretation is reasonable under controlling principles of statutory interpretation. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also INS v. Cardoza-Fonseca,* — U.S. —, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). We further conclude, as to the pivotal question presented on appeal, that the agency's interpretation can lawfully be applied to New York under the circumstances presented. Accordingly, we affirm.

I

The statute in question is mind-numbing in complexity. Happily, the labyrinthine scheme was thoroughly explored by the Departmental Grant Appeals Board in the course of its decision upholding HHS' disallowances. *See New York State Department of Social Services,* No. 449 (July 29, 1983), Joint Appendix (J.A.) at 162 (hereinafter Board Decision). For our purposes, a brief (albeit inevitably complex) summary of the statute's structure and pertinent provisions will suffice.

A

Title IV-A of the Social Security Act authorizes federal grants to States participating in the AFDC program. 42 U.S.C. §§ 601–615. Participating States are those that have submitted, and had approved by HHS, plans for providing income maintenance payments and social services to needy families. 42 U.S.C. § 601. In 1961, Congress added section 408 to Title IV-A, which provided for federal financial participation (FFP) in state expenditures for the program of interest in this case, namely, Aid to Families With Dependent Children-Foster Care (AFDC-FC). 42 U.S.C. § 608 (1976).[1] The AFDC-FC program not only

---

1. In 1980, Congress repealed section 408 and transferred the AFDC–FC program to the newly enacted part E of Title IV, effective at the option of the States as early as October 1980 but no later than October 1982. Pub.L. No. 96–272, 94 Stat. 501 (1980) (Part E codified at 42 U.S.C. §§ 670–676 (1982 & Supp. III 1985)). References to the foster care program, and to all other

authorized income maintenance payments on behalf of eligible foster children, but also *required* States to include in these plans certain social services for program beneficiaries. 42 U.S.C. § 608(f).

From at least 1972 to 1975, state expenditures for required foster care services were federally subsidized under section 403(a)(3) of the Act. That section provided for reimbursement of administrative costs necessary for the efficient administration of a Title IV-A state plan. 42 U.S.C. § 603(a)(3). Although the required foster care services would not, standing alone, fit within the rubric of "administration," section 408(d) provided that foster care services described in section 408(f) were to be considered part of the administration of the state plan for purposes of section 403(a)(3). 42 U.S.C. § 608(d). Thus, until 1975 foster care service costs were reimbursed as administrative costs necessary for the administration of a state plan.

### B

With that general background, we turn to the amendments of over a decade ago, whose interpretation provides the backdrop of this case. In 1975, Congress broadly restructured social services programs for AFDC recipients. Pub.L. No. 93-647, 88 Stat. 2337 (1975). Congress transferred the social services component of Title IV-A [2] to a newly enacted part of the Social Security Act, Title XX. Title XX, captioned "Grants to States for Services," es-

tablished a comprehensive program for States' provision of federally subsidized social services. 42 U.S.C. § 1397a (1976). It continued to provide for FFP in state expenditures for these services, but only up to a specified appropriations ceiling or cap. 42 U.S.C. § 1397a(a)(2)(A). Included within the broad ambit of Title XX were "services for children and adults in foster care." 42 U.S.C. § 1397a(a)(1).[3]

Consistent with the transfer of Title IV-A's social services provisions to new Title XX, the 1975 amendments altered section 403(a)(3) to eliminate funding under Title IV-A for the costs of nearly all social services. Pub.L. No. 93-647, § 3(a)(3), 88 Stat. 2348 (1975); *see also* H.R.Rep. No. 1490, 93d Cong., 2d Sess. 19 (1974). This result was accomplished by bringing into being the "except clause," which figures prominently in this case. As amended, section 403(a)(3) continued to permit reimbursement of a percentage of state *administrative* costs for AFDC programs (i.e., the costs attendant to providing beneficiaries with income maintenance payments); however, Congress included the following proviso:

> *except* that no payment shall be made with respect to amounts expended in connection with the provision of any service described in section 1397a(a)(1) [of Title XX of this Act] other than services the provision of which is required by [section 402(a)(19) of this Act] to be included in the plan of the State.[4]

---

provisions of the Social Security Act, are to the sections of the Act in effect during the relevant period, i.e., 1975 to 1980.

**2.** The "social services component" of Title IV-A included services States were required to provide for AFDC recipients by section 402(a)(14). 42 U.S.C. § 602(a)(14) (1974). Prior to 1975, section 403(a)(3)(A)(i) of Title IV-A provided for FFP in the costs of these services. The 1975 amendments repealed, *inter alia,* sections 402(a)(14) and 403(a)(3)(A)(i). Pub.L. No. 93-647, § 3(a)(2), 88 Stat. 2348 (1975). Thus, after the 1975 amendments Title IV-A provided for income maintenance payments and activities directly associated with providing beneficiaries with such payments; almost all references to social services had been repealed.

**3.** Section 1397a(a)(1)(C) permitted reimbursement for services directed at the goal of "pre-

venting or remedying neglect, abuse, or exploitation of children and adults unable to protect their own interests, or preserving, rehabilitating, or reuniting families." The statute listed foster care as one type of service designed to further this general goal. 42 U.S.C. § 1397a(a)(1).

**4.** The "services ... required by [section 402(a)(19)]" are found in subsection (G). Section 402(a)(19)(G) of the Act, 42 U.S.C. § 602(a)(19) (1982 & Supp. III 1985), refers to social and supportive services necessary to enable certain AFDC recipients to accept employment or receive manpower training under the Work Incentive Program (or "WIN" program). The WIN program was established by Title IV-C of the Act, 42 U.S.C. §§ 630-645 (1982 & Supp. III 1985).

42 U.S.C. § 603(a)(3) (emphasis added). Section 1397a(a)(1), which is referred to in the "except clause," expressly mentions foster care services; in consequence, the "except clause" of section 403(a)(3) by its terms appears to prohibit reimbursement for the costs of providing foster care services. Those costs, it would seem, must be claimed only under Title XX.

Notwithstanding the apparent clarity of the "except clause," the new statutory structure was muddied by virtue of a remnant from the pre–1975 regime, section 408(d). That provision states that certain foster care costs *are* reimbursable under section 403(a)(3). As noted above, under section 408(d) foster care activities (described in subsection 408(f)) are to be "considered as part of the administration of the State plan for purposes of [section 403(a)(3)]." 42 U.S.C. § 608(d).[5] Since the only purpose of section 403(a)(3) is to provide for federal matching of particular state AFDC expenditures, section 408(d) appears to instruct the federal government to reimburse States for the designated foster care services as administrative costs of the state plan.

### C

In the uncertainty engendered by these maze-like provisions, New York and several other States continued to budget expenditures on foster care services in the belief that reimbursement under Title IV–A would be forthcoming. The practice adopted by New York in the wake of Title XX's enactment came to be known as the "AFDC–FC shift." Board Decision, *supra* p. 3, J.A. at 166; Brief for Appellant at 14–15. The technique worked this way. New York claimed (and received) reimbursement for social services under Title

XX until the State reached the statutory cap. When the Title XX cap was reached, New York then switched from Title XX to claim the unreimbursed social service costs under Title IV–A.[6]

Six years after the 1975 amendments, HHS published an agency-wide directive elucidating the operation and interplay of the provisions at issue. Under HHS' interpretation, the "AFDC–FC shift" was impermissible; FFP was, in the agency's view, *not* available for foster care cost recovery under Title IV–A. Aid to Families with Dependent Children Action Transmittal, SSA–AT–81–18 (June 24, 1981), J.A. at 117. In October 1981, the HHS Regional Office applied this determination to disallow one of New York's claims. New York appealed to the Departmental Grant Appeals Board, which in July 1983 affirmed the disallowance. Subsequently, two other claims were disallowed and similarly affirmed. This litigation followed contesting the disallowances, which amount to approximately $66 million.

### II

New York argues that the foster care services which it provided remained eligible for matching grants as "administrative costs" under section 403(a)(3). In New York's view, the "except clause" precludes only payment for *services* described in Title XX and does not directly address the status of such services that also qualify, pursuant to section 408(d), as *administrative costs,* under Title IV–A. Brief for Appellant at 30–31. Unpersuaded by New York's interpretation, the Board construed the "except clause" flatly to prohibit FFP in the costs of state foster care service activities regardless of whether the costs could also be considered administrative costs.

---

**5.** Section 408(d) specifically refers only to subsection 408(f)(2), which describes the categories of employees who are to carry out, to the extent practicable, the activities specified in subsection 408(f)(1). Thus, under a literal reading of section 408(d), States could obtain reimbursement under 403(a)(3) only for the costs associated with the employees described in subsection 408(f)(2) rather than for all the costs of the services themselves. It appears, however, that prior to 1975 the agency permitted FFP in the costs of all the activities referred to in subsection 408(f). *See* J.A. at 71; Brief for Appellees at 4.

**6.** It bears noting here that Title IV–A offered a lower percentage of reimbursement (fifty percent, as compared to the seventy-five percent provided under Title XX), but it had the singular advantage of having no cap.

The apparent inconsistency infecting the statute's various provisions need not detain us. We readily accept the proposition that the Act is, in pertinent part, ambiguous (if not internally contradictory), as eloquently attested by the conflicting interpretations adopted by various HHS officials and components, which we shall describe presently. Indeed, in this appeal New York has not contested the validity of HHS' 1981 determination that foster care activities are *not* reimbursable under Title IV–A of the Act; instead, the State insists that this interpretation, albeit reasonable, may not permissibly be applied to it. Relying on internal memoranda and a letter from HHS' Region II (the field office charged with overseeing the Empire State), New York contends that HHS "officially" interpreted the "except clause" in 1977 to permit reimbursement of foster care service costs. Brief for Appellant at 11–13. That being the case, the State argues, the contrary interpretation embodied in HHS' 1981 Action Transmittal represented a change in the agency's interpretation of the statute, the retroactive application of which is "arbitrary and capricious" within the meaning of a familiar provision of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982). *Id.* at 39–41. Specifically, New York argues that the factors identified by this court in *Retail, Wholesale and Department Store Union, AFL–CIO v. NLRB*, 466 F.2d 380 (D.C.Cir.1972), as recently elucidated by the court *en banc* in *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074 (D.C.Cir.1987), relating to the permissibility of a *retroactive application* of a new agency interpretation, preclude application of HHS' 1981 interpretation to New York's pre–1981 claims. *Id.* at 40, 48.

### III

█ The history of the agency's treatment of this question during the relevant period unmistakably reveals inconsistency within HHS as to New York's claims generally and, more specifically, the import of the "except clause." To begin at the beginning: In November 1976, Region II disallowed New York's first claim following the 1975 amendments for reimbursement of foster care costs under Title IV–A. The Regional Office grounded its disallowance on the State's failure to allocate its claimed costs between income maintenance and social services activities as required by HHS regulations. *See* 45 C.F.R. § 232.30 (1976). Region II did not, however, mention the "except clause" of section 403(a)(3) as a basis for its decision.

In June 1977, the Regional Office had a change of heart. Region II sent New York an informational copy of its recommendation to the Central Office that the November 1976 disallowance of New York's claim be withdrawn. Memorandum from William Toby, Regional Commissioner Region II (June 17, 1977), J.A. at 85 (hereinafter Toby Memorandum). Also enclosed in the Region's correspondence was an informational copy of a May 18, 1977, memorandum that apparently induced the Region's change in position. The one-page memorandum from one Mildred Hoadley, then Director of Income Maintenance Policy in the Assistance Payments Administration in HHS' Central Office in Washington, D.C., to an Associate Regional Commissioner in California, asserted, without mentioning section 403(a)(3), that "a State may claim [reimbursement] under title IV–A for carrying out any provision required in title IV–A." Memorandum from Mildred Hoadley, Director, Division of Income Maintenance Policy (May 18, 1977), J.A. at 86 (hereinafter Hoadley Memorandum). Citing the Hoadley Memorandum, Region II stated in its recommendation to the Central Office that "any and all of the activities performed by service workers for AFDC–FC children in New York and claimed for in the disallowance claim are allowable." Toby Memorandum, *supra* p. 9, J.A. at 85. According to New York, this communication represented the agency's first official interpretation of the amended Act. Brief for Appellants at 12.

Shortly after informing New York of its intention to reconsider the 1976 disallowance, the Regional Office instructed New York to revise its Title IV–A cost allocation procedure. J.A. at 91. Region II stated that all AFDC–FC activities could be

claimed as administrative costs reimbursable under section 403(a)(3), referring to the Hoadley Memorandum. *Id.* Dutifully following the Regional Office's suggestion, New York continued its practice of claiming foster care costs under Title XX until its allotment was exhausted, at which time it effected the "AFDC–FC shift." Some of its Title IV–A claims were paid, while "[o]thers remained in various stages of bureaucratic limbo for the next four years." *New York State Department of Social Services v. Bowen,* 648 F.Supp. 850, 853 (D.D.C.1986).

As might be expected in a vast bureaucracy, not all components within HHS embraced the interpretation articulated by Ms. Hoadley and Region II. In fact, prior to distribution of Ms. Hoadley's one-page analysis, another component of HHS produced a more extensive memorandum setting forth a contrary interpretation. This interpretation appeared in a February 1977 memorandum produced in HHS' Office of General Counsel and distributed to the Acting Commissioner of the Assistance Payments Administration. Memorandum from Ronald N. Sutter, Attorney, Office of General Counsel (Feb. 23, 1977), J.A. at 70. Examining the statute's background, language, and the legislative history of the 1975 amendments, the memorandum concluded that funding "is clearly unavailable for the services described in section 408(f)(1)" and "the better reading of the statute" precludes funding under section 408(f)(2). *Id.*

In November 1977, however, the Acting Associate Commissioner, the recipient of this memorandum, stated in a one-page letter to the Regional Commissioner in Seattle that Title IV–A funds *are* available for the administrative costs of the States' foster care programs. J.A. at 90. Similarly, the Office of General Counsel subsequently rejected the 1977 memorandum's conclusion that the "better reading" of the statute

precludes funding for services described in section 408(f)(2). J.A. at 96, 101–03.

Thus, the pre–1981 history of the treatment of this narrow issue reveals that there were various and conflicting interpretations of the statute within HHS. To be sure, the majority view, as it were, favored the allowance of the "AFDC–FC shift." But more fundamentally, a dispassionate examination of the facts supports the following conclusion: notwithstanding various informal statements or representations in favor of permitting reimbursement, there was no *official* HHS interpretation of the statute prior to 1981. No authoritative pronouncement in the form of an Action Transmittal or other formal agency statement of position was forthcoming until that later time.

New York is, of course, of a different view. The State asserts that the Hoadley Memorandum, in conjunction with Region II's actions, represented the official HHS position on the issue. We cannot agree. The memorandum on its face represented only the recapitulation of a telephone conversation between two mid-level agency employees. Hoadley Memorandum, *supra* p. 9, J.A. at 86. This rather abbreviated interpretation contained no statement of the statutory or regulatory basis for its stated conclusion; indeed, it did not even mention the "except clause" specifically or section 403(a)(3) more generally. *Id.* This is informality in the extreme. In addition, we have been referred to nothing supporting the remarkable proposition that a mid-level official enjoyed the authority to issue an official HHS interpretation in an informal memorandum. New York points to no statute, regulation, or written policy statement indicating that this odd source of policymaking authority did in fact exist.[7]

The decidedly informal procedure used to arrive at this interpretation contrasts sharply with the process that culminated in the agency's position officially articulated in 1981. The 1981 interpretation was predi-

---

**7.** In other settings, Congress has, in effect, delegated to certain agency employees the authority to issue interpretations or approvals that are binding on the agency if promulgated in conformity with established procedures. *See* 15 U.S.C. § 1640(f) (1982) (reliance on official Federal Reserve Board staff interpretations or approvals provides creditors with good faith defense to liability).

cated on a lengthy memorandum setting forth a thorough analysis of the arguments for and against each position. And the position it settled upon was embraced by high officials in the Department. After reviewing the various interpretive options, the Acting Commissioner of Social Security opted in favor of the now-challenged interpretation, which was then forwarded to the Office of the General Counsel for review and approval. The Commissioner of Social Security duly informed the Secretary of HHS in writing of his position. Finally, and importantly, the interpretation was thereafter memorialized in an Action Transmittal, which we are informed is one of the established vehicles for the formal memorialization and communication of official agency policy. *See* SSA–AT–78–28 (Action Transmittal setting forth the procedures to be followed for issuances of policy statements to States) (noted in Board Decision, *supra* p. 361, J.A. at 180). This, then, represented formal agency action upon which affected parties could reasonably rely, in contrast to the informal, non-authoritative nature of what had gone before.

Our conclusion that the actions of the agency prior to 1981 did not rise to the level of an official agency interpretation pretermits the need to address specifically New York's arguments under the *Retail, Wholesale-Clark Cowlitz* line of authority concerning retrospective application of newly-minted agency interpretations. It is manifest that, in the absence of an official HHS interpretation prior to 1981, the Department's Action Transmittal in that year did not embody a *change* in the agency's position. Instead, it represented the first official, binding pronouncement on the question, overriding the informal views to the contrary previously articulated within the bureaucracy. Although we find nothing commendable in HHS' course of action, redounding as it does to New York's obvious detriment, we cannot discern any reason in law why the agency's hands must be tied by such informal representations at non-authoritative echelons of the agency's hierarchy.

For the foregoing reasons, the District Court's judgment is

*Affirmed.*